| | |
|---|---|
| TILCON NEW YORK, INC.,<br>*Plaintiff,*<br>*v.*<br>*INDEMNITY INSURANCE CO. OF NORTH AMERICA,*<br>*Defendant.* | Civil No. 3:14-cv-1296<br>(JBA)<br><br>May 10, 2017 |

**RULING ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Tilcon New York, Inc. ("Tilcon" or "Plaintiff") brings this action against Defendant Indemnity Insurance Co. of North America ("IINA" or "Defendant") alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-815, in connection with Defendant's refusal to cover a claim under a bumbershoot insurance policy (a type of umbrella marine insurance policy providing excess coverage) that Plaintiff purchased to supplement a Protection & Indemnity policy it held with American Home. By Ruling on the Motion to Transfer/Dismiss State Court Claims, the Court determined that the IINA Bumbershoot policy is a maritime contract and that it had subject matter jurisdiction pursuant to 28 U.S.C. 1331(1) (maritime jurisdiction), that federal choice-of-law rules apply and that to the extent federal admiralty law does not apply, Connecticut law would apply, and dismissed Plaintiff's claims under CUIPA and portions of its claims concerning the breach of the implied covenant of good faith and fair dealing dependent on an alleged, but unsupported, duty to defend. (Ruling on Mot. to Transfer/Dismiss [Doc. # 40] at 8-9, 14.) The case proceeded on the question of breach of contract and breach of the implied covenant in other respects. (*Id.* at 14.) The parties now cross-move for

summary judgment [Docs. ## 69, 72]. For the reasons set forth below, the Court DENIES the parties' cross-motions for summary judgment.

## I.   Background

### A.   The Underlying Injury and Commencement of Underlying Lawsuit

Tilcon is a New York-based company that provides road construction services, operates quarries and asphalt plants, and produces construction materials that are transported throughout New York and New Jersey by truck, barge, and rail. (Ruling on Mot. to Transfer/Dismiss at 2.) Tilcon owns and operates a quarry and a maritime terminal in Clinton Point, New York on the Hudson River where it loads gravel and stone aggregate onto barges for delivery to construction sites. (Pl.'s D. Conn. L. Civ. R. 56(a)1 Stmt. ("Pl.'s 56(a)1") [Doc. # 72-11] ¶¶ 1-2; Def.'s D. Conn. L. Civ. R. 56(a)2 Stmt. ("Def.'s 56(a)2") [Doc. # 76] ¶¶ 1-2.) The barges themselves have no engines or ability to steer, and Tilcon uses tugboats (called "push boats") to maneuver the barges to the dock. (Pl.'s 56(a)1 ¶ 10; Def.'s 56(a)2 ¶ 10; Ex. 4 to Stern Decl. ("Kechejian Tr.") [Doc. 70-1] at 13:4-23.) Once a barge is maneuvered up to the dock for loading, it is affixed to the dock by a set of cables. These cables, which are tightened and loosened by a winch, propel the barge along the dock so that, as it moves, the gravel being loaded into the barge is evenly distributed. (Pl.'s 56(a)1 ¶¶ 15-17; Def.'s 56(a)2 ¶¶ 15-17.) Another set of cables runs between the barge and the dock. The lines are shackled to the dock in such a way that they permit the barge to move along the dock but prevent it from drifting away from the dock. As aggregate is loaded into the barge, two Tilcon employees rake it to a flat surface so that purchasers can better estimate volume; the employees who perform this job are called "trimmers." (Pl.'s 56(a)1 ¶¶ 19-20; Def.'s 56(a)2 ¶¶ 19-20.)

In the underlying lawsuit, *Ronkese v. Tilcon New York et al.*, Tilcon employee Richard Ronkese alleged that on October 15, 2004, while working as a trimmer aboard a barge called the

Nicola Lizza, he was struck by a cable that snapped, causing injury. (Pl.'s 56(a)1 ¶ 42; Def.'s 56(a)2 ¶ 42; Ex. I ("Ronkese Complaint") to Pl.'s 56(a)1 [Doc. # 72-26] ¶¶ 16-18; Def.'s D. Conn. L. Civ. R. 56(a)1 Stmt. [Doc. # ("Def.'s 56(a)1") [Doc. # 70] ¶ 15; Pl.'s D. Conn. L. Civ. R. 56(a)2 Stmt. ("Pl.'s 56(a)2") [Doc. # 72-12] ¶ 15).[1]

In Mr. Ronkese's complaint, he alleged that he was injured "when a cable snapped/parted, striking plaintiff's body . . . [and] propelling his body with great force and velocity to the deck of" the barge. (Ronkese Complaint ¶ 18.)[2] This allegation coheres with Tilcon's expert's description of the accident, drawn from a "Lost Time Injury Report" prepared by Tilcon after the accident. The expert recounts that "Mr. Ronkese was struck in the face/head by a line attached to a 200 foot-long 7/8 inch diameter steel stationary cable running parallel to the dock." (Ex. K ("Junge Report") to Pl.'s 56(a)1 [Doc. # 72-28] at 8.) The line that struck Mr. Ronkese was one of the lines that permitted the barge to move along the dock but that prevented it from drifting away.

Mr. Ronkese filed suit on September 7, 2007—just shy of three years after his injury—in New York Supreme Court, Ulster County, alleging that the snapped cable caused him to suffer shoulder and neurocognitive injuries. (Ronkese Complaint ¶ 18.) In the years between the injury and the suit, Mr. Ronkese collected $260,000 in New York State Workers Compensation benefits. (Def.'s 56(a)1 ¶ 16-17; Pl.'s 56(a)2 ¶¶ 16-17.)

---

[1] Defendant denies ¶ 42 of Plaintiff's 56(a)1 Statement, apparently rejecting Plaintiff's description of the contents and nature of Mr. Ronkese's lawsuit, but a reading of Mr. Ronkese's complaint shows that ¶ 42 accurately reflects the salient allegations in Mr. Ronkese's complaint.

[2] Because coverage under the Protection & Indemnity policy was not at issue, the New York Supreme Court in deciding the cross-motions for summary judgment in the underlying dispute did not make detailed factual findings on the cause of Mr. Ronkese's injury, stating only that the injuries were "sustained during the course of [Mr. Ronkese's] work as a trimmer. . . ." (Ex. J ("New York Supreme Ruling") to Pl.'s 56(a)1 Stmt. [Doc. # 72-27] at 3.)

At the time of the suit, there was dispute at Tilcon about the severity of Mr. Ronkese's injuries. David Toolan, Deputy General Counsel for Tilcon's parent and Assistant Secretary of Tilcon, testified as 30(b)(6) witness for Tilcon that it had received Mr. Ronkese's workers compensation file, complete with summaries of independent medical examination reports indicating that Mr. Ronkese had suffered neurocognitive injuries, but he also testified that Mr. Ronkese's coworkers had seen him at the gym lifting weights without apparent difficulty. (Toolan 30(b)(6) Tr. 57:13-58:22.) Cross motions for summary judgment were filed in the underlying action on April 30, 2012, and after the court denied the motions on Sept. 28, 2012, Tilcon settled with Mr. Ronkese for $3.25 million.

### B. Ownership of the Barge Nicola Lizza

At the time of Mr. Ronkese's injury, Tilcon did not own the barge Nicola Lizza. Rather, the barge was held in trust for the benefit of Buchanan Marine, L.P. (Ex. 6 ("Declaration of the Buchanan Trust # 54") to Stern Decl. [Doc. # 70-1] (setting forth terms of trust); Ex. 7 ("Bareboat Charter") to Stern Decl. [Doc. # 70-1] (setting forth in Schedule A the list of vessels, including the Nicola Lizza, held in trust and subject to the bareboat charter).)

This trust, the Buchanan Trust # 54, was established by Buchanan Marine, Inc. as grantor and names A.P. Franz Jr. as trustee and Buchanan Marine, L.P. as beneficiary. (Declaration of the Buchanan Trust # 54.) Under a separate bare-boat charter agreement, the trust then licenses the vessels it holds to Buchanan Marine, L.P. and gives Buchanan Marine, L.P. the rights to "man, victual, navigate, operate, supply, fuel, maintain and repair" the vessels, including the Nicola Lizza, while ensuring that the trustee retains full legal title. (*See* Bareboat Charter, § 8(a)-(b)).

At the time of the underlying accident, through common corporate parentage, Plaintiff Tilcon New York was an affiliate of both the grantor of the trust, Buchanan Marine, Inc., and the

beneficiary and bare-boat charterer, Buchanan Marine, L.P., in virtue of the following corporate relations: Plaintiff's parent corporation Tilcon, Inc. wholly owned two subsidiaries, Plaintiff Tilcon New York, Inc., and a sister corporation that is not a party to this action, Tilcon Connecticut, Inc. (Ex. 2 to Stern Decl. ("Toolan 30(b)(6) Tr.") [Doc. # 70-1] at 10:11-13, 11:1-17.) Tilcon Connecticut, Inc. wholly owned Buchanan Marine, Inc., the grantor of the trust and former owner of the vessels in the fleet. (*Id.* at 11:20-22.) Buchanan Marine, Inc., was a 25% limited partner in Buchanan Marine, L.P., the beneficiary of the trust and the bare-boat charterer. (*Id.* at 12:20-21.)[3]

### C.    The Underlying Insurance Policy

The underlying "Protection & Indemnity" ("P&I") policy, Number B215204, was issued by American Home Insurance Company for the period July 20, 2004 to July 20, 2005 to the Named Assureds "Buchanan Marine, LP and/or Northeast Bulk Material Movers, Inc., Richard Jurczak as General Partner, Buchanan Marine, Inc., and Tilcon of NY." (Ex. D., Tab 2 to Toolan Decl., ("American Home Policy") [Doc. # 72-19] at 2-3.)[4]

---

[3] The apparent purpose of this complex ownership structure was to attempt compliance with the Jones Act, which requires that vessels engaged in domestic maritime trade ("cabotage") be owned and operated by qualified U.S. citizens. One of the citizenship requirements for qualified U.S. citizens is that they (whether ultimate parent or intervening subsidiary) be at least 75% beneficially owned by U.S. citizens. *See* 46 U.S.C. § 50102 *et seq.* (the "Jones Act"); Constantine Papavizas, *Public Company Jones Act Citizenship*, 39 Tulane Maritime L.J. 384, 387 (2015). Mr. Toolan testified that "the barge would have actually been owned by the Buchanan Marine Inc. through a trust, or managed through a trust entity because of some of the Jones Act regulations and the fact that we have a foreign corporate parent . . . ." (Toolan Tr. at 14:2-5.)

[4] The policy lists four Named Assureds on the first page: "Buchanan Marine, LP and/or Northeast Bulk Material Movers, Inc., Richard Jurczak as General Partner, Buchanan Marine, Inc., and Tilcon of NY." (American Home Policy at 2-3.) In contrast to the "Named Assured," the policy defines the "Assured" as "Buchanan Marine LP, Northeast Bulk Material Movers, Inc., Buchanan Marine, Inc." and does not list Tilcon. (*Id.* at 2.) The parties did not address the potential ambiguity arising from the fact that Tilcon is listed as a "Named Assured," but not as an "Assured." Despite

The underlying P&I policy insured 14 specifically enumerated kinds of risk (including mutiny, plague, and damage to docks or piers) and with regard to personal injury, the policy declared:

> The Assurer hereby undertakes to make good to the Assured . . . all such loss and/or damage and/or expense as the Assured shall **as owners of the vessel named herein** have become liable to pay and shall pay on account of the liability, risks, events and/or happenings herein set forth:
> (1) liability for loss of life of, or personal injury to, or illness of, any person, **excluding, however, unless otherwise agreed by endorsement herein**, liability under any Compensation Act to any employee of the Assured (other than a seaman) or in case of death to his beneficiaries or others. . . .
>
> Protection hereunder for loss of life or personal injury arising in connection with the handling of cargo of the vessel named herein shall commence from the time of receipt by the Assured of the cargo on dock or wharf or on craft alongside the said vessel for loading thereon and shall continue until delivery thereof from dock or wharf of discharge or until discharge from the said vessel on to another vessel or craft.

---

this apparent distinction, the contract taken as a whole, the conduct of the parties, and the representations made during oral argument suggest the two terms are coextensive and that Tilcon should be treated as an "Assured."

First, the term "Named Assured" does not repeat in the contract, but is used only once on the declarations page and then abandoned. The contract as a whole refers only to the "Assured" and does not appear to treat the terms "Named Assured" and "Assured" as different. By contrast, the CGL policy that American Home issued to Tilcon explicitly distinguishes between "Assured" and "Named Assured" in its definition section, and it assigns different rights and responsibilities to Assureds and Named Assureds. (*See* Ex. D to Tab 3 ("CGL Policy") to Toolan Decl. [Doc. # 17-20].) Second, when American Home reviewed the Ronkese claim, it treated Tilcon as an "Assured" and denied coverage on other grounds. (Denial of Coverage Letter, *passim*.) Third, at oral argument, counsel for Defendant insisted that Tilcon would have been covered as an Assured for the two vessels it owns, the Paige E and the Ike. If, hypothetically, the policy distinguished between "Assured" and "Named Assured," and only covered Assureds, then Tilcon would not be covered because it was merely listed as a Named Assured.

(*Id.* at 3 (first emphasis added; second emphasis in original).) Under the first sentence of this clause, the policy only covers Assureds for losses they incur "*as owners of the vessel named herein* . . . ." Thus, absent amendment, this policy only covers the Assureds insofar as they own the vessels at issue. The parties concede that Tilcon owned two vessels, the Ike and the Paige E, and counsel for Defendant suggested at oral argument that Tilcon would have been covered under the P&I policy for injuries occurring aboard those two vessels.

Ten endorsements accompanied the policy.[5] The list of insured vessels was attached to the policy as an endorsement and included the Nicola Lizza for a premium of $466.00. (*Id.* at 14.) The fifth endorsement, a so-called "Affiliated Companies Clause" that appears to expand coverage and which is the focus of the parties' interpretive dispute, declared:

<u>Affiliated Companies Clause</u>
It is agreed that the following additions to, and amendments of, the printed form of this policy are, hereby, made a part of the policy:

A. In respect of the vessel insured hereunder, this policy also covers the Assured and affiliated, subsidiary, interrelated and associated companies and persons, be they owners, or bareboat charterers, sub-charterers, or operators, including stockholders, officers, directors, partnerships, limited liability partnerships or corporations, executors, estates trustees, fiduciaries, and any other associated, owned, affiliated, allied or subsidiary entities or persons as now exist or may hereafter be constituted and shall continue to cover, notwithstanding the provisions of this policy with respect to change of ownership or management. Provided however, that in the event of any claim being made by any affiliated, subsidiary or interrelated company under this clause, it (they) shall not be entitled to recover in respect of any liability to which it (they) would not be subject if it (they) were the owner of the vessel and not to a greater extent than an owner would be entitled in such event to recover. . . .

---

[5] An "endorsement" in the jargon of insurance is "an amendment to an insurance policy." *Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 305, 348 (2002).

(*Id.* at 17.)

### D.   The Bumbershoot Policy

In addition to this primary policy, Buchanan Marine L.P. contracted with Defendant IINA to provide a commercial marine bumbershoot[6] policy, No. 1174538 (the "Bumbershoot Policy"). On its application, Buchanan Marine L.P. stated that its business was "towing" and that it leased a small shipyard in New Haven as well as "staging areas" throughout New York, New Jersey, and Connecticut. (Ex. 11 ("Bumbershoot Application") to Stern Decl. [Doc. # 70-1] at 1.) The Bumbershoot Policy listed the Named Assureds as "Buchanan Marine LP, Buchanan Marine Inc., Northeast Bulk Material Movers, Inc., Tilcon NY Inc." and extended from July 20, 2004 to July 20, 2005. It provided the following coverage:

> This policy is to indemnify the Assured in respect of the following (including such expenses as are set out in the definition of "Ultimate Net Loss"):
>
> (a) all Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the underlying Protection & Indemnity Insurances
> . . . .
> (c) All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:
>> (i) Personal Injuries, including death at any time resulting therefrom;
>> (ii) Property Damage;
> caused or arising out of each occurrence happening anywhere in the world. Notwithstanding the foregoing, this insurance shall not cover liabilities arising by reason of insolvency or inadequacy of capital.

---

[6] A bumbershoot policy is "a marine insurance policy covering multiple liability coverages in excess of one or more different underlying policies (comparable to the Commercial Liability Umbrella covering liabilities on land)." *Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 305, 325 (2002)

(Ex. D, Tab 1 ("Bumbershoot Policy") to Pl.'s 56(a)1 [Doc. # 72-18].)

The policy set forth certain conditions on coverage, including a notice provision that required:

> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which in the event that the Assured should be held liable, is likely to involve this Policy, notice should be sent to [INAMAR Marine Claims] as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

(*Id.* at 4.) Under an "Assistance and Specification" condition, the policy further specified that IINA "shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding" in connection with a claim that could trigger bumbershoot coverage, and required that the "Assured, the Underlying Insurers and Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding." (*Id.* at 5.)

### E. Notification and Denial of Coverage

After Mr. Ronkese filed suit in September 2007, Tilcon gave notice of the lawsuit to American Home "for recordkeeping purposes." (Ex. H to Pl.'s 56(a)1 ("Colella Tr.") at 52-53.) Peter Colella, the insurance broker who arranged for the policy, was the one who instructed Tilcon's lawyer to give notice. He testified that he qualified his instruction—"for recordkeeping purposes"—because "the Jones Act case is a bit of a stretch because [Mr. Ronkese] has been a workers comp claimant, but we should put [the primary insurer] on notice." (Colella Tr. at 53:5-9.) He later testified that he did not "recall putting [the] excess [insurer] on notice so quickly after finding out myself, but I know that at some point in the not too distant future from this point [we]

would have had discussions about putting an excess insurer on notice because of the size of this claim." (*Id.* at 57:1-6.)

Nine months after filing suit, in June 2008, Mr. Ronkese voluntarily dismissed his claims against all defendants except his employer, Tilcon New York. (Def.'s 56(a)1 at ¶ 33; Pl.'s 56(a)2 at ¶ 33.) Inexplicably, in September 2008, Tilcon instructed American Home to close its file even though Tilcon was still a party to this live suit. (Def.'s 56(a)1 ¶¶ 34-35; Pl.'s 56(a)2 ¶¶ 34-35.) Mr. Collella closed his file as well, believing that the lawsuit was over.[7] (*Id.*) In November 2011, Mr. Ronkese filed a supplemental bill of particulars identifying damages in excess of $10 million. (Def.'s 56(a)1 ¶ 36; Pl.'s 56(a)2 ¶ 36; Ex. 21 to Def.'s 56(a)1).[8] At a January 9, 2012 pre-trial conference, Mr. Ronkese made a settlement demand of $25 million. At that conference, the court ordered that motions for summary judgment be filed by April 30, 2012 and scheduled trial for October 15, 2012. (Def.'s 56(a)1 ¶ 37; Pl.'s 56(a)2 ¶ 37.) Tilcon filed its motion for summary judgment on April 30, 2012, and Mr. Ronkese filed a cross motion for summary judgment. (Def.'s 56(a)1 ¶ 40; Pl.'s 56(a)2 ¶ 40.) On May 9, 2012, after Tilcon's motion for summary judgment was filed, Tilcon put IINA on notice that its level of insurance could be reached. (Def.'s 56(a)1 ¶ 41; Pl.'s 56(a)2 ¶ 41.)

On June 20, 2012, American Home sent Tilcon a letter denying some coverage and reserving rights on all coverage, explaining that four of Mr. Ronkese's claims—the non-seaman's claims—were not covered because they arose out of Tilcon's ownership and management of the

---

[7] The record does not contain much evidence to explain how Mr. Colella reached this conclusion. At deposition, he testified that he believed he was "copied in on an email that said you may close your file." (Colella Tr. 59:25-60:1.)

[8] In New York practice, a party may file a demand for a bill of particulars requesting details regarding the case. (CPLR § 3042.) The opposing party has 30 days to respond with specific details. (*Id.*)

loading dock and the quarry, not out of ownership of the Nicola Lizza. (Ex. 19 ("Denial of Coverage Letter") to Stern Decl. [Doc. # 70-2] at 4.) Further, American Home reserved its rights to deny coverage on the other counts because Tilcon's direction to 'close the file' and its failure to keep American Home notified of the status of the Ronkese action amounted to waiver and forfeiture of its claim for coverage, and its failure to provide prompt notice, as well as its failure to permit American Home to associate with and assist in the defense of the claim likewise undermined its claim. (*Id.* at 4-8.) Notably, American Home did not issue its reservation of rights with respect to the seaman's claims on the basis that Mr. Ronkese's injury did not fall within the scope of risks insured by a Protection & Indemnity policy, and it did not reserve rights on the basis of Tilcon's non-ownership of the barge.

The New York court denied the cross motions for summary judgment on Sept. 28, 2012, after which a settlement conference was held. The parties' conduct leading up to and at the conference is in dispute: IINA claims that it offered to attempt to settle with Mr. Ronkese if Tilcon agreed to a loan-receipt agreement under which it would reimburse IINA for any settlement if IINA subsequently determined there was no coverage. (Def.'s 56(a)1 Stmt. ¶ 48.) IINA claims that Tilcon rejected this offer and then independently settled with Mr. Ronkese for $3.25 million. (Def.'s 56(a)1 Stmt. ¶¶ 49-50.) Tilcon claims that it settled with Mr. Ronkese after consultation with counsel for the underlying insurance agency and that IINA simply refused to indemnify it after the settlement. (Pl.'s 56(a)1 Stmt. ¶¶ 46, 48-49; Def.'s 56(a)2 Stmt. ¶ 46)

Despite its initial reservation of rights, American Home tendered its liability limit of $1 million under the policy toward the settlement. (*See* Ex. 25 ("Toolan Letter") to Stern Decl. [Doc. # 70-2]) ("the American Home Assurance Company ('Chartis') tendered the policy limit of the

underlying policy on October 11, 2012 . . . .") IINA refused coverage under the Bumbershoot policy and notified Tilcon of its denial in early 2014.

## II.    Discussion

The parties cross-move for summary judgment. Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c). The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The court must examine the merits of each motion independently and in each case must consider the facts in the light most favorable to the non-moving party. *Id.* at 121.

### A.    Coverage under the Protection & Indemnity Policy

The Bumbershoot Policy provides the following coverage:

> This policy is to indemnify the Assured in respect of the following (including such expenses as are set out in the definition of "Ultimate Net Loss"):
> (a) all Protection and indemnity risks of whatsoever nature including, but not limited to, those covered by the underlying Protection & Indemnity Insurances . . .

(Bumbershoot Policy at 2.)

Defendant argues that summary judgment in its favor is appropriate because Mr. Ronkese's injury is not covered by the underlying P&I policy and coverage under subsection (a) of the Bumbershoot policy only extends to those risks covered by the underlying P&I policy. (Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 71] at 8.)[9] Plaintiff counters that the plain language of the Bumbershoot policy, because it incorporates the underlying American Home policy as modified by Endorsement Five, necessarily covers Plaintiff. To determine coverage under the P&I policy, two questions must be answered: (i) does the claim fall within the type of risk covered by the policy? and (ii) is Tilcon insured under the P&I policy with respect to injuries that happen aboard the Nicola Lizza?

### 1. Legal Standard

Construction of a contract of insurance presents a question of law for the court. *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 37 (2014). "The terms of an insurance policy are to be construed according to the general rules of contract construction . . . . The determinative question is the intent of the parties, that is, what coverage the . . . provisions of the policy. . . ." *Liberty Mut. Ins. Co. v. Lone Star Indust., Inc.*, 290 Conn. 767, 795-96 (2009). That expressed intent, however, is to be found by "examining the contract or policy as a whole" rather

---

[9] Without explanation, Defendant's Motion for Summary Judgment addresses the legal standard for an action seeking declaratory judgment, but Defendant's pleadings do not seek declaratory judgment.

than looking to extrinsic evidence. *Lexington Ins. Co.*, 311 Conn. at 58. Where the intent is unclear

because a true ambiguity exists, the rule in Connecticut is that the interpretation that "will sustain

the claim and cover the loss must, in preference, be adopted." *Rydingsword v. Liberty Mut. Ins. Co.*,

224 Conn. 8, 15 (1992).

When properly incorporated into a policy, endorsements are part of the contract of

insurance and "are to be read together to determine the contract actually intended by the parties."

*Lexington Ins. Co.*, 311 Conn. at 57. An endorsement is "a writing added or attached to a policy or

certificate of insurance which expands or restricts its benefits or excludes certain conditions from

coverage." *Id.* at 55 (citing 2 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 18:17, p. 18-

24).

> [T]he endorsement and policy must be read together, and the policy remains in full
> force and effect except as altered by the words of the endorsement; conversely the
> endorsement modifies, to [the] extent of the endorsement, the terms and
> conditions of the original insurance contract. . . . If any irreconcilable conflict exists
> between provisions of the policy and provisions of an endorsement, then the latter
> must control.

*Schultz v. Hartford Fire Ins. Co.*, 213 Conn. 696, 705 (1990) (citing 13A J. Appleman, Insurance

Law and Practice § 7537).

### 2. Types of Risk Covered Under a P&I Policy

The underlying P&I policy insured all "loss and/or damage and/or expense as the Assured

shall as owners of the vessel named herein have become liable to pay" "for [among 14 specifically

enumerated risks] personal injury to . . . any person." (P&I policy.) The policy further specified

that

> Protection hereunder for . . . personal injury arising in connection with the
> handling of cargo of the vessel named herein shall commence from the time of

receipt by the Assured of the cargo on dock or wharf or on craft alongside the said vessel for loading thereon . . . .

Defendant asserts that Mr. Ronkese's injury was not the type of risk that is covered by P&I insurance and relies on jurisprudence developed in the Fifth Circuit regarding the interpretation of P&I policies to support its claim. In that line of Fifth Circuit cases, "under terms or language similar to SP-23 the assured must be liable as owner of the insured vessel; liability in any other capacity is irrelevant." *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., Inc.*, 666 F.2d 932, 942 (5th Cir. 1982).

In the Fifth Circuit, "as owner" is taken to limit coverage in two ways. First, it restricts the scope of *who* is insured: operators, charterers and employers are not covered. Second, it restricts the scope of the *type of risk* insured. In the seminal case of *Lanasse v. Travelers Ins. Co.*, the Fifth Circuit affirmed denial of coverage under a P&I policy where a worker was injured aboard a vessel because a crane operator, working on an adjacent oil rig, negligently lifted a piece of equipment from the deck of the vessel to transfer it onto the rig and accidentally knocked the equipment against the worker. Affirming denial of coverage, the Fifth Circuit noted that

> There must be at least some causal operational relation between the vessel and the resulting injury. The line may be a wavy one between coverage and noncoverage, especially with industrial complications in these ambiguous amphibious operations plus those arising from the personification of the vessel as an actor in a suit in rem. But where injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury. Nothing more occurred here, for it was Chevron's actions as a platform operator or as a crane operator that caused the harm, and that does not make it a liability of a shipowner

*Lanasse v. Travelers Ins. Co.*, 450 F.2d 580, 584 (5th Cir. 1971).

In *St. Paul Fire & Marine*, which Defendant urges on the Court, the Fifth Circuit affirmed this principle, reasoning that

> [T]he "causal operational relation" test enunciated in *Lanasse v. Travelers Ins. Co.*, governs the disposition of this case . . . . Under *Lanasse*, whether the liability of the owner arises 'as owner' depends upon the causal connection between the action that gave rise to the liability and the ownership, operations, maintenance, or use of the vessel.

*St. Paul Ins. Co.*, 105 F.3d at 654.

Despite this apparent limitation on the types of risk insured, even the Fifth Circuit's conception of "causal operational relation" is capacious: In *St. Paul*, the cause of the injury for which the claimant sought coverage was a car accident that occurred while four sailors were traveling to the insured ship in order to outfit it for voyage. The trial court concluded, and the Fifth Circuit affirmed, that "although the harm arose out of nonvessel operations-a car accident at least sixty miles away from the vessel-the employees were utilizing transportation provided by [the owner] to effect a crew change and to deliver supplies as ordered by [the owner] in preparation for the vessel's departure." *Id.*

The Second Circuit has not staked out a definitive interpretive position with respect to the range of risks insured by a P&I policy, but its decisions suggest a historical, more eclectic view of the scope of coverage under P&I policies:

> [T]he historical roots of this variety of marine insurance explain certain of its unique characteristics. The policies were first issued by clubs of shipowners to insure against risks for which they could not obtain commercial coverage; therefore, classically . . . claims for any loss, damage, or liability which could be covered . . . under the standard form of hull policy [which covers damage to the vessel itself] are excepted from the P & I policy. The risks covered by the policy are therefore a somewhat miscellaneous group of "left-overs," including those caused by rare and catastrophic occurrences such as plague, as well as those posed by more mundane difficulties.

*Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 503 (2d Cir. 1972). Indeed, the Second Circuit has explicitly distinguished its reading of the standard terms of a P&I policy

from the Fifth Circuit's and required more expansive, individualized treatment in instances where the insurer was aware that the insured ran a hybrid business as both ferry transport and rail carrier. *N.Y. Cross Harbor R.R. Terminal Corp. v. Atlantic Mut. Ins. Co.*, 852 F.2d 38, 44 (2d Cir. 1988) (P&I policy covered car hire fees assessed as liquidated damages for breach of rail transport contract despite defendant's argument that this risk did not arise out of plaintiff's status as shipowner).

Under either the "causal operational relation" test of *Lanasse* or the more eclectic historical approach of the Second Circuit, the injury at issue here is covered by the policy. First, the expansive language of the personal injury clause in the policy, which affords coverage for "personal injury to . . . any person," captures Mr. Ronkese's injuries sustained aboard the Nicola Lizza. Second, the policy explicitly envisions Mr. Ronkese's injury when it provides: "Protection hereunder for . . . personal injury arising in connection with the handling of cargo of the vessel named herein shall commence from the time of receipt by the Assured of the cargo . . . on craft . . . ." Mr. Ronkese was injured while raking the cargo—stone aggregate—into a level surface so that its volume could be properly estimated. Third, the injury was caused by a cable used to maneuver the barge safely during loading. These facts contrast with *Lanasse*, in which the negligence of a crane operator on a different vessel, with obscured view of the object he was moving, caused the injury. Finally, as noted above, American Home did not reserve rights regarding coverage on the seaman's claims, implicitly conceding that they were of a type covered by its policy. The Court concludes that Mr. Ronkese's injury was of the type of risk covered by the P&I policy.

### 3.    Entities Covered by the Policy

The emphasis of Defendant's argument against coverage focuses on the second inquiry: whether the P&I policy's limitation of coverage to shipowners means that Tilcon is not covered.

Defendant asserts that because "there is no genuine dispute that Tilcon did not own the barge Ronkese was injured upon," "the claim was not a 'protection and indemnity risk' involving a vessel owner and no coverage is afforded under the IINA policy." (Def's Mem. Supp. Mot. Summ. J. at 11.) It is undisputed that Tilcon did not own the Nicola Lizza.

Defendant's argument, however, disregards the effects of the fifth endorsement, the Affiliated Companies Clause, on the scope of coverage under the underlying policy. This Endorsement reads:

> In respect of the vessel insured hereunder,[10] this policy also covers the Assured and affiliated, subsidiary, interrelated and associated companies and persons, be they owners, or bareboat charterers, sub-charterers, or operators, including stockholders, officers, directors, partnerships, limited liability partnerships or corporations, executors, estates trustees, fiduciaries, and any other associated, owned, affiliated, allied or subsidiary entities or persons as now exist or may hereafter be constituted and shall continue to cover, notwithstanding the provisions of this policy with respect to change of ownership or management. Provided however, that in the event of any claim being made by any affiliated, subsidiary or interrelated company under this clause, it (they) shall not be entitled to recover in respect of any liability to which it (they) would not be subject if it (they) were the owner of the vessel and not to a greater extent than an owner would be entitled in such event to recover. . . .

(American Home Policy at 18.) Plaintiff argues that this clause expands the coverage for each vessel insured under the contract (a total of 255, all held in trust by A.P. Franz, Jr.) to each of the four Assureds. When faced with Plaintiff's reliance on this clause, Defendant replies that the Endorsement only expands the scope of coverage to those affiliates that "have an ownership interest in the vessel to be insured" and no further. (Def.'s Opp'n [Doc. # 75] at 5.)

---

[10] The parties do not dispute that the Nicola Lizza falls under the broad category of "vessels insured hereunder." It is listed on the schedule of vessels at page 12. (*See* Toolan Decl., Tab 2 at 12.)

The Court views Defendant's reading as a misconstruction of the meaning of the word "Assured," the placement of the adverb "also," and the scope of the phrase modified by the clause "be they owners, or bareboat charterers, sub-charterers, or operators . . . ."

The defined term "Assured" includes four entities: Buchanan Marine, L.P., Northeast Bulk Material Movers, Inc., Buchanan Marine, Inc., and Tilcon of NY. As discussed above, the un-amended P&I policy does not cover all Assureds equally; an Assured must be a shipowner in order to receive coverage. Defendant argues with some force that Tilcon would be covered for injuries occurring on each of the two vessels it owns, the Ike and the Paige E, but not for any other vessel in the fleet. This argument loses its force, however, in the face of the plain language of the fifth endorsement, which declares that "In respect of the vessel insured hereunder, this policy also covers the Assured and affiliated, subsidiary, interrelated and associated companies and persons . . . ."

In order for the placement of the adverb "also" to make sense, the endorsement must extend coverage in some way. Since each Assured was already covered with respect to the vessels it owned, the most natural reading of the placement of "also" extends coverage for each Assured to the vessels it does not own.

Defendant argues that even if "the Assured" is "also" covered, it is only covered insofar as it is an "owner, bareboat charterer, sub-charterer or operator" and that, if an Assured plays none of these roles, it is not covered.

The phrase "be they owners, or bareboat charterers, sub-charterers, or operators" modifies "affiliated, subsidiary, interrelated and associated companies and persons," but does not modify "Assured." Although the string of adjectival modifications does create potential ambiguity, the most natural reading of the sentence treats the adjectival phrase beginning with "be they" as

modifying the string of nouns immediately preceding it, the "affiliated companies." Moreover, as noted above, ambiguities are construed in favor of coverage. Other courts have agreed, construing the "be they" clause to modify only the "affiliated companies" immediately preceding, and not placing any restrictions on the role in which an Assured is covered. *C.f. SW Traders, LLC v. United Specialty Ins. Co.*, No. C-09-778 (MJP), 2009 WL 5215762 (W.D. Wash. Dec. 29, 2009), *aff'd* 409 Fed. App'x 96.

More importantly, Defendant overlooks the function of the second sentence of the endorsement, the proviso, which limits the ways in which any covered entity can recover: "it (they) shall not be entitled to recover in respect of any liability to which it (they) would not be subject if it (they) were the owner of the vessel and not to a greater extent than an owner would be entitled in such event to recover." This limitation prevents any covered entity from recovering for risks that do not fall within the scope of the insured risks, and it prevents any covered entity from recovering more than the actual shipowner would recover for the same injury. This proviso would not be necessary if the endorsement only expanded coverage to entities with an ownership interest, or if it limited the roles that affiliated companies could play in order to be covered.

Significantly, American Home never reserved rights or denied coverage to Mr. Ronkese on the underlying P&I policy for the reasons now asserted by Defendant, and American Home ultimately tendered its policy limit. Thus, the parties to the P&I contract seem to agree that, whatever shortcomings in Tilcon's notice to American Home, the risk was of the type covered by the policy and Tilcon was a covered entity under the policy. Even if Defendant has raised some metaphysical doubts about whether nor not the language of the contract is unambiguous, those doubts are overcome by the agreement between the parties to the contract that, under the contract, Tilcon was covered and American Home would pay its claim.

The Court concludes that the Affiliated Companies Clause in the fifth endorsement extended coverage to Tilcon with respect to injuries occurring on the Nicole Lizza. Because this risk was covered under the underlying P&I policy, it is a risk that is covered under (a) of the Bumbershoot policy.

### B. Breach of Contract for Failure to Timely Notify

Defendant argues that even if Tilcon was covered with respect to risks occurring aboard the Nicola Lizza, IINA is not liable because Tilcon failed to provide notice in accord with the requirements of the Bumbershoot policy. The policy requires that

> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which in the event that the Assured should be held liable, is likely to involve this Policy, notice should be sent to [INAMAR Marine Claims] as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

(Bumbershoot Policy.)

The parties do not dispute that "[t]he test for determining whether notice of occurrence must be given to a particular insurer is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim against that insurer." *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 43 (2d Cir. 1991).

> [I]n the context of notice provisions, 'as soon as practicable' means 'as soon as can reasonably be expected under the circumstances.' The duty to give notice does not arise unless and until facts develop which would suggest to a person of ordinary and reasonable prudence that liability may have been incurred, and is complied with if notice is given within a reasonable time after the situation so assumes an aspect suggestive of a possible claim for damages

*Arrowood Indem. Co. v. King*, 304 Conn. 179, 199 (2012).

Defendant concedes that "Connecticut law requires that the insurer seeking to avoid coverage due to late notice must first establish it has been materially prejudiced." (Mem. Supp. Mot. Summ. J. at 16); *see also Arrowood Indem. Co.* at 725-26 (overruling the prior rule of *Aetna Casualty & Surety Co.* that imposed the burden on the insured and holding that "the insurer bears the burden of proving, by a preponderance of the evidence, that it has been prejudiced by the insured's failure to comply with a notice provision").

The timeline established above shows that Tilcon failed to provide notice "as soon as practicable." Mr. Ronkese was injured in the Fall of 2004. By September 9, 2006, an IME report by Dr. Richard P. DeBenedetto prepared in connection with Mr. Ronkese's workers' compensation claim found that he suffered a neurocognitive disability causally related to his injury and that "Mr. Ronkese is not expected to be able to effectively manage the usual demands of daily living as well as the demands and responsibilities of his former work as a barge trimmer." (Junge Report [Doc. # 72-28] at 4.)

Between September 2006 and December 2007, Mr. Ronkese underwent five IMEs, which counsel for Plaintiff characterized in a 2009 e-mail to Tilcon's claims adjuster, copies of which were sent to two people at Tilcon and one at an affiliate, as each doing more damage to Tilcon's case than the prior one. (Ex. 17 to Stern Decl. ("Ficks email") [Doc. # 70-2].)[11] These IMEs found that Mr. Ronkese's "cognitive deficits [are] causally related to [his] accident;" that he has a "moderate to severe neurocognitive disorder," that he "has reached maximum medical improvement," and

---

[11] Attorney Ficks of the law firm Halloran & Sage was hired by Buchanan Marine Inc. to defend Buchanan and its affiliates against Mr. Ronkese's claim.

that "he has an extremely poor prognosis" and "is not capable of returning to work." (*Id.*) Mr. Ronkese treated with 16 doctors in addition to these IMEs. (*Id.*)

Mr. Ronkese filed suit in 2007, definitively placing Tilcon on notice of a claim against it. Although Tilcon may have had some reason to believe Mr. Ronkese was malingering, the 2009 Ficks email, in concert with the pendency of an actual lawsuit, leaves no open question that Tilcon was aware of facts that would suggest to a reasonable person that liability had been incurred and that the bumbershoot policy would be reached. Waiting until 2012 to notify IINA breached its timely notice obligation.

Defendant argues that Plaintiff's delay prejudiced IINA in the following manner: (1) IINA was not given opportunity to "associate in the defense of the Ronkese litigation" or "to file a federal limitation of liability action in favor of vessel owner Buchanan which would have moved the matter to a federal venue" (Def.'s Mem. Supp. Mot. Summ. J. at 16-17); (2) IINA was not given an opportunity to conduct discovery (*Id.*); and (3) IINA was not given an opportunity to draft or review Tilcon's motion for summary judgment in the underlying action. (*Id.*) In addition, IINA voices skepticism that it would have pursued the same strategic litigation choices as Tilcon, suggesting that it would have urged Tilcon to appeal the New York court's denial of summary judgment in the underlying action or pushed it to trial and that separate counsel should have been appointed for Tilcon and Buchanan. (*Id.*)

Tilcon responds that IINA's actual conduct shows that it was not prejudiced. First, even though IINA was notified in May 2012, it failed to review Mr. Ronkese's case file until three months later. (Pl.'s Mem. Supp. at 29-30.) Second, it appointed coverage counsel, and never intended to associate in the defense of the Ronkese action. (*Id.*) Kristen Swingle, the IINA employee who

handled Tilcon's claim,[12] testified that had IINA wanted to participate in the underlying defense, "we would have used a different counsel." (Ex. N ("Swingle Tr.") to Pl.'s 56(a)1 Stmt. [Doc. # 72-31] at 57:19.) She further testified that the summary judgment motion papers were filed in August 2012 and that "we would have had the opportunity" to participate in defense of the motion for summary judgment. (*Id.* at 92: 20-22.)

Tilcon further argues that IINA was not prejudiced because IINA denied coverage for the contract reasons listed above: it believed that the Ronkese action was not a covered P&I risk and it believed that Tilcon had not become legally obligated to pay the claim at issue in the action. (Pl.'s Mem. Supp. Mot. Summ. J. at 32-33.) Tilcon reasons that earlier notification would simply have resulted in an earlier denial of coverage.

There thus remain open factual disputes as to whether and how IINA was prejudiced by Tilcon's late notice. Where there are genuine issues of material fact as to whether delay in notification prejudices an insurer, summary judgment is inappropriate. *State Farm Fire & Cas. Co. v. Yoel*, No. 13-cv-101 (AWT), 2014 WL 4182614 (D. Conn. Aug. 21, 2014) (denying motion for summary judgment when unclear whether earlier notice would have allowed insurer to develop facts of case). Indeed, although *Arrowood* overruled *Aetna Cas. & Sur. Co.* with respect to who bears the burden, it continues to recognize the principle that "a proper balance between the interests of the insurer and the insured requires a factual inquiry into whether, in the circumstances of a particular case, an insurer has been prejudiced by its insured's delay in giving notice of an event triggering insurance coverage." *Aetna Cas. & Sur. Co. v. Murphy*, 206 Conn. 409, 417-18 (1988), *overruled on other grounds by Arrowood*, 304 Conn. at 202-03.

---

[12] *See* Ex. 27 to Def.'s 56(a)1 [Doc. # 70-2].

C.   **Breach of Contract for Failure to Permit Assistance**

IINA asserts as a final defense that Tilcon's late notification precluded IINA's right to participate in the defense. Under the "Assistance and Specification" condition, the policy specified that IINA "shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding." IINA claims that Tilcon's voluntary settlement of the claim at a settlement conference over IINA's objection robbed it of that right.

Tilcon relies on the Swingle testimony cited above about IINA's intentions to show that IINA was not robbed of any such chance to associate because it had no intention of participating in the defense of the claim.

As with the question of prejudice arising out of Tilcon's delay in providing notice, the parties here have raised genuine questions of material fact as to whether IINA was prejudiced by its inability to participate in the defense.

III.   **Conclusion**

For the reasons set forth above, the Court DENIES the parties' cross-motions for summary judgment.

IT IS SO ORDERED

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of May 2017.