UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TILCON OF NEW YORK, INC., *Plaintiff*, v. INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, *Defendant*. | Civil No. 3:14-CV-1296 (JBA)<br><br>June 16, 2017 |

**RULING ON DEFENDANT'S MOTION FOR RECONSIDERATION**

On May 10, 2017, the Court issued a ruling [Doc. # 83] (the "Summary Judgment Ruling") denying the parties' cross-motions for summary judgment. On May 18, 2017, eight days after entry of the order, Defendant Indemnity Insurance Company of North America ("IINA") moved [Doc. # 84] for reconsideration, seeking an entry of summary judgment on behalf of IINA, claiming the Court misconstrued the scope of coverage in the underlying Protection and Indemnity ("P&I") policy and claiming the Court misconstrued the fifth endorsement, an "Affiliated Companies Clause." Additionally, by letter [Doc. # 88] Defendant requests permission to supplement its Motion to Reconsider to reference two quotations from this Court's prior Ruling on the Motion to Transfer or Dismiss [Doc. # 40].[1] The Court assumes familiarity with the underlying facts and recites them only as necessary to provide proper context. For the reasons set forth below, the Court denies Defendant's Motion.

---

[1] As set forth in the Court's pretrial preferences, it does not consider letter briefs appropriate. *See* Pretrial Preferences, available at http://www.ctd.uscourts.gov/content/janet-bond-arterton (last accessed June 15, 2017). Moreover, the Court is aware of its prior rulings and Defendant's letter request is therefore denied.

## I. Background

Defendant IINA, an insurer, sold a bumbershoot policy (a type of marine umbrella insurance policy) to Plaintiff Tilcon of New York ("Tilcon"), a New York road-construction and related services company that owns and operates a quarry and maritime terminal on the Hudson River. (*See* Summary Judgment Ruling at 2.) The bumbershoot policy provided excess coverage to an underlying Protection and Indemnity Policy (the "P&I Policy") that Tilcon carried with American Home. (*Id.*)

This dispute arises out of Defendant's refusal to cover Plaintiff's indemnification claim under the bumbershoot insurance policy related to litigation against Plaintiff by Mr. Richard Ronkese, a Tilcon employee who was badly injured when struck by a cable while loading gravel onto a barge called the Nicola Lizza. (*Id.*)

Several facts are undisputed by the parties: Tilcon does not own the Nicola Lizza, which is held in trust with Buchanan Marine, L.P. as beneficiary of the trust and A.P. Franz Jr. as trustee. (*Id.* at 4.) Although it is not an owner of the barge, Tilcon is listed as a Named Assured on the Declaration Page of the underlying P&I policy. (*Id.*) The underlying P&I policy provides the following promise:

> The Assurer hereby undertakes to make good to the Assured . . . all such loss and/or damage and/or expense as the Assured shall **as owners of the vessel named herein** have become liable to pay and shall pay on account of the liability, risks, events and/or happenings herein set forth:
>
> (1) liability for loss of life of, or personal injury to, or illness of, any person, **excluding, however, unless otherwise agreed by endorsement herein**, liability under any Compensation Act to any employee of the Assured (other than a seaman) or in case of death to his beneficiaries or others. . . .

(*Id.* at 6.) The fifth endorsement to the P&I policy, an "Affiliated Companies Clause," modifies the scope of coverage, although the parties dispute how it modifies coverage. In pertinent part, it reads:

> In respect of the vessel insured hereunder, this policy also covers the Assured and affiliated, subsidiary, interrelated and associated companies and persons, be they owners, or bareboat charterers, sub-charterers, or operators, including stockholders, officers, directors, partnerships, limited liability partnerships or corporations, executors, estates trustees, fiduciaries, and any other associated, owned, affiliated, allied or subsidiary entities or persons as now exist or may hereafter be constituted and shall continue to cover, notwithstanding the provisions of this policy with respect to change of ownership or management.

(*Id.* at 7.)

## II. Legal Standard

Motions for reconsideration "shall be filed and served within seven (7) days of the filing of the decision or order from which such relief is sought, and shall be accompanied by a memorandum setting forth concisely the controlling decisions or data the movant believes the Court overlooked." D. Conn. L. Civ. R. 7(c)1. The Second Circuit has explained that "[t]he major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18B C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 4478). This standard is "strict" and reconsideration should be granted only if "the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). If "the moving party seeks solely to relitigate an issue already decided," the court should deny the motion for reconsideration and adhere to its prior decision. *Id.*

### III. Discussion

Defendant's Motion for Reconsideration, filed eight days after the ruling sought to be reconsidered, is untimely under D. Conn. L. Civ. R. 7(c)1. While a "failure to timely file a motion for reconsideration may constitute sufficient grounds for denying the motion," courts in this district have entertained untimely filed motions in the interests of justice. *See Palmer v. Sena*, 474 F. Supp. 2d 353, 355 (D. Conn. 2007). However, even if entertained despite untimeliness, Defendant's Motion falls short of the strict standards required for reconsideration, as discussed below.

Defendant references no intervening change in controlling law nor evidence newly available. Rather, it argues that the Court has made a clear error that requires correction on reconsideration, but Defendant points to no particular clear error. Plaintiff argues that under this guise, Defendant seeks merely to relitigate issues already decided. (Opp'n [Doc. # 89] at 4.) To ensure that it has not overlooked a piece of the record which would likely change the prior result, the Court reviews each of Defendant's arguments.

First, Defendant contends that the Court "rejected [the] established principle of marine insurance" that "generally . . . coverage under a protection and indemnity policy extends only to the liability the insured incurs in its capacity as an owner, operator or charterer of the vessels." (Mem. Supp. Mot. for Reconsideration [Doc. # 84-1] at 2.)

However, in fact, the Ruling noted that the restriction of coverage to an insured "in its capacity as owner" limits coverage in two ways: (1) the restriction limits the *types of risk* insured, and (2) it limits *who* is insured (Summary Judgment Ruling at 15) and found that Mr. Ronkese's injury fell within the "type of risk" covered by the policy (*id.* at 17). The Court's discussion then turned to whether Tilcon was one of the insured entities, addressing Defendant's contention that

4

the P&I policy did not cover Tilcon because Tilcon did not own the Nicola Lizza. As it ruled, "the un-amended P&I policy does not cover all Assureds equally; an assured must be a shipowner in order to receive coverage." (*Id.* at 19.) Without amendment, the P&I policy at issue would not cover Tilcon. Thus, the Court did not reject the principle that in general, coverage under a P&I policy extends only to insureds in their capacity as owners, only that under the language of the fifth endorsement—the Affiliated Companies Clause—coverage was *extended* from the usual scope of coverage to include Tilcon. (*Id.* at 21.)

Second, Defendant argues that the Court misinterpreted the bumbershoot policy to be a "follow the form" or "follow the fortunes" policy requiring excess coverage whenever the underlying policy provided coverage and that the Court mistakenly concluded that because the underlying insurer paid its limits and did not reserve its rights with respect to the claims at issue, IINA is similarly required to pay. (Mem. Supp. Mot. for Reconsideration at 3.) But the Ruling did not hold that the bumbershoot policy was a follow the form policy; it treated American Home's decision not to reserve rights and ultimately to pay as some evidence that Mr. Ronkese's injury may have been the type of risk covered by the policy which covered Tilcon. Even if there is no significance to be drawn from American Home paying its limits, the Courts' interpretation of the fifth endorsement is unaffected. As discussed below, the Affiliated Companies Clause extends coverage to Tilcon because it is a Named Assured and the meaning of the particular affiliated companies clause at issue here is independent of American Home's actions.

Third, Defendant again argues that coverage under both the underlying policy and the bumbershoot policy extends only to claims that Tilcon becomes "legally liable to pay." (Mem. Supp. Mot. for Reconsideration at 4.)[2]

The language of the underlying policy, however, does not support this assertion, as it simply states that the insurer will "make good" "all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein *have become liable to pay* and shall pay on account of the liabilities, risks, events and/or happenings herein set forth: (1) liability for . . . personal injury to . . . any person." (P&I Policy [Doc. # 72-19] (emphasis added).) The terms of this policy do not require that Tilcon become "legally liable" to pay a claim, but merely that it become liable to pay.

Defendant's argument likewise mischaracterizes Section (1)(c) of the bumbershoot policy, which clearly would require payment when the Assured becomes "legally liable to pay" a claim but also when the Assured becomes "liable to pay" "by contract or agreement." The bumbershoot policy reads:

> This policy is to indemnify the Assured in respect of the following (including such expenses as are set out in the definition of "Ultimate Net Loss"):

---

[2] Defendant appears to argue that the underlying P&I policy explicitly excludes claims covered by compensation acts, including the Longshore and Harbor Workers' Compensation Act (the "LHWCA") and that Mr. Ronkese was so covered because he was not a Jones Act seaman, but a harbor worker. This argument is inconsistent with the position Defendant took in its Motion for Summary Judgment, in which it explicitly declared that Mr. Ronkese's status was irrelevant to the coverage issues. (Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 71] at 12.). In a section entitled "Ronkese's status as either a Jones Act seaman or LHWCA worker is irrelevant," IINA argued that "the relevant issue for coverage is not Ronkese's status, but Tilcon's status." (Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 71] at 12.) After explicitly declaring the irrelevance of this issue, IINA may not revive it on reconsideration.

6

> (a) All Protection & Indemnity risks of whatsoever nature including, but not limited to, those covered by the underlying Protection & Indemnity Insurances or which are absolutely or conditionally undertaken by the United Kingdom Mutual Steam Ship Assurance Association, Limited.
>
> . . . .
>
> (c) All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of (i) Personal Injuries, including death at any time resulting therefrom. . . .

(Bumbershoot policy [Doc. # 72-18].) Because the Court concluded that Tilcon was covered under Section (1)(a) of the bumbershoot policy, it did not need to drop down to section (1)(c), but were it to do so, the language of the policy is not limited in the way Defendant maintains.

Fourth, Defendant again argues that the Affiliated Companies Clause does not extend coverage to Tilcon, stating that "the Court apparently overlooked the undisputed evidence (including the deposition testimony of marine insurance expert John Weber) as to the understanding of an Affiliated Companies Clause in the maritime insurance business." (Mem. Supp. Mot. for Reconsideration at 9.) However, Defendant cites to no portion of the testimony of Mr. Weber nor any passage in his Declaration which it claims the Court overlooked. In fact, Mr. Weber's Declaration [Doc. # 78] does not support Defendant's contention. In stating that drop-down coverage under Section 1(c) of the bumbershoot policy would not be triggered, Mr. Weber declared: "[B]efore 'drop down' can apply, the insured must establish that it had no other insurance coverage potentially applicable to the loss. Here, Tilcon had several other insurances available for the claim. Specifically, American Home's protection and indemnity policy [the underlying policy in the present dispute] responded to the claim and Tilcon accepted the benefits of the American Home policy." (Weber Decl. ¶ 5.) Mr. Weber's Declaration thus inferentially supports the conclusion that the P&I policy covered Tilcon's claim.

Moreover, Mr. Weber's expert report is silent on the Affiliated Companies Clause, shedding no light on its customary interpretation in the marine industry. Although Mr. Weber testified at deposition about the effect of the Affiliated Companies Clause in general (stating, e.g. that "I don't think it extends coverage beyond owners,") he did not address the specific language of this particular policy, and he did not address how the placement of the adverb "also" affects the meaning of the first clause of the endorsement. (See Ex. 23 to Stern Decl. [Doc. 70-2] at 118:5-123:15.) Thus, while he explains how affiliated companies clauses in general work, he does not explicate the specific language of the policy at hand.

That specific language reads:

> In respect of the vessel insured hereunder, this policy also covers the Assured and affiliated, subsidiary, interrelated and associated companies and persons, be they owners, or bareboat charterers, sub-charterers, or operators, including stockholders, officers, directors, partnerships, limited liability partnerships or corporations, executors, estates trustees, fiduciaries, and any other associated, owned, affiliated, allied or subsidiary entities or persons as now exist or may hereafter be constituted and shall continue to cover, notwithstanding the provisions of this policy with respect to change of ownership or management.

(Summary Judgment Ruling at 7.)

The Court found that the placement of the adverb "also," under the most natural reading, extends coverage to non-owner Assureds as well as to any affiliated, subsidiary, interrelated or associated companies whose status is that of an owner, bareboat charterer, sub-charterer, or operator. "In order for the placement of the adverb 'also' to make sense, the endorsement must extend coverage in some way. Since each Assured was already covered with respect to the vessels it owned, the most natural reading of the placement of the 'also' extends coverage for each Assured to the vessels it does not own." (Summary Judgment Ruling at 19.)

While Defendant clearly disagrees with the Court's interpretation of the particular language of this Affiliated Companies Clause, it fails to show how the interpretation is manifestly erroneous, particularly where the deposition testimony of Mr. Weber fails to address the particularities of the instant situation—four Named Assureds each with different ownership interests in a fleet of boats and a large family of other affiliated companies who are not Named Assureds—or the language of the instant contract.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for reconsideration is denied.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of June, 2017.